## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KHODARA ENVIRONMENTAL II, )
General Partner and on behalf of EAGLE )
ENVIRONMENTAL II, L.P. )
                     ) CIVIL ACTION NO. 3:2002-96
        Plaintiff, )
                     )
     v. )
                     ) JUDGE GIBSON
CHEST TOWNSHIP, )
                     )
        Defendant. )

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

This civil action comes before the Court on the parties' cross-motions for partial summary judgment. For the reasons stated herein, the Plaintiff's Motion for Partial Summary Judgment (Document No. 99) is denied and the Defendant's Motion for Partial Summary judgment (Document No. 102) is granted in part without objection and denied in part.

### I.    **Summary Judgment Standards**

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is the duty of the movant to establish that the record demonstrates an "absence of a genuine issue of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986).

"The substantive law [identifies] which facts are material. Only disputes over facts that might

affect the outcome of the suit under the governing law properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202, 211 (1986). As to the genuineness of an issue of material fact, an issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202, 212.

The non-movant can defeat a motion for summary judgment provided that he produces "affirmative evidence" beyond the content of his pleadings that demonstrates the existence of a genuine issue of material fact that remains for trial. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). "Such affirmative evidence-regardless of whether it is direct or circumstantial-must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Id.* (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460-461 (3d Cir. 1989)).

In reviewing a motion for summary judgment, the Court is obligated to "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

## II.    **Plaintiff's Motion for Partial Summary Judgment**

### A.    **Synopsis**

Khodara Environmental II, General Partner and on behalf of Eagle Environmental II, L.P. (hereinafter "Plaintiff" or "Eagle II") moves for partial summary judgment against Chest Township (hereinafter "Defendant" or "Township") as to Count IV of the Third Amended Complaint (hereinafter "TAC"). Count IV sets forth a claim for breach of contract, specifically the alleged breach of the Host

Community Agreement (Document No. 100-6, pp. 24-38) between Eagle Environmental, L.P. (hereinafter "Eagle I") and the Defendant. As developed in the statements of undisputed material facts, it is the Plaintiff's position that this agreement as well as the Excess Maintenance Agreement (Document No. 100-7, pp. 4-12) and the Addendum (Document No. 100-7, pp. 14-17) were legally assignable and were in fact assigned by Eagle I to the Plaintiff. The Plaintiff argues that summary judgment should be granted as to Count IV because the Defendant has repudiated the Host Community Agreement causing an anticipatory breach of contract. Plaintiff's Brief (Document No. 101), pp. 6-8. The Defendant disputes this contention arguing that when the Pennsylvania Department of Environmental Protection (hereinafter "PaDEP") denied a permit to Eagle I in 1996, the agreements became void as they were dependent upon the granting of the permit.

This Court, in the Order of Court dated May 24, 2005 (Document No. 44), adopted the report and recommendation of Magistrate Judge Pesto and declared that all three agreements were assignable to the Plaintiff and validly assigned but did not pass upon the issue of any breach of the Host Community Agreement.

The following are statements of undisputed material fact as submitted by the parties. Any facts not contained herein were either found to be immaterial, disputed or both. The original numbering of the facts is retained for the ease of referencing the parties' submissions.

## B. Statement of Facts

### Plaintiff's Statements

1. Eagle II owns property in Chest Township upon which it plans to construct...and operate a residual solid waste disposal and processing facility.

2.    On August 3, 2001, the Pennsylvania Department of Environmental Protection ("PaDEP") issued Solid Waste Disposal Permit No. 301311 ("Waste Permit") to Eagle II, pursuant to which Eagle II was authorized to construct and operate a residual solid waste disposal and processing facility in Chest Township (identified as the Royal Oak Landfill). Eagle II's permit became void on August 3, 2006, because "no residual waste [was] processed or disposed under [the] permit within 5 years of the date of issuance." 25 Pa. Code § 287.211(e).

3.    When it applied for the Waste Permit, Eagle II represented to PaDEP that it was a party to contracts with the Township that, among other things, gave Eagle II the right to use Township roads to access the proposed landfill. This representation became a basis upon which PaDEP relied when it issued the landfill permit.

4.    On September 6, 2001, the Township appealed PaDEP's issuance of the Waste Permit to the Pennsylvania Environmental Hearing Board ([hereinafter]"EHB").

5.    The Township's appeal asked the EHB to overturn PaDEP's decision and revoke the Waste Permit....

6.    In support of its appeal to the EHB, the Township argued that the Waste Permit should be revoked because the permit

incorrectly states that there exists a Host Community Agreement between Chest Township and [Eagle II] . To the contrary, there was previously a Host Community Agreement between Eagle Environmental, L.P. ["Eagle I"] and the Township of Chest dated June 11, 1994. That Agreement became void as a matter of law on November 26, 1996 when the Department denied [Eagle I's] permit application. At the time of the purported assignment, [Eagle I] had no legal right to assign a void Agreement to [Eagle II]. The Department erred in

4

issuing a permit when it was advised by the Chest Township Solicitor that the Host Community Agreement was void.

8. The Township's appeal to the EHB claimed that it "has not authorized the use of township roads T[-]409 or T[-]412, as alleged in the permit application."

9. The Township's appeal to the EHB claimed that PaDEP "erred in issuing a permit to a landfill operator where it has no access to the landfill."

10. Eagle II sought relief from this Court, commencing litigation in March 2002.

11. In its April 18, 2002 answer and affirmative defenses to Eagle II's complaint, the Township stated that Host Community Agreement was "void" as of November 1996 and that "there was never a Host Community Agreement between [the Township and Eagle II]." The Township, likewise, denied that it ever entered into the Addendum and, even if it had, claimed that the Addendum was "void" as of November 1996.

12. In subsequent depositions in this action, as well as in its responses to interrogatories, the Township reiterated its position that the Host Community Agreement was void and of no further effect and, further, that Eagle II did not have a right to make use of the easement granted to Eagle I by the Addendum.

13. In April 2002, after Eagle I had assigned its interests in the Host Community Agreement and the Addendum to Eagle II , and after Eagle II had already filed its complaint in this Court, the Township filed an action for declaratory judgment in the Clearfield County Court of Common Pleas against Eagle I. The Township's action sought a declaration that the Host Community Agreement became void as of November 1996.

5

14. Following entry of a default judgment against Eagle I, the Clearfield County Court of Common Pleas, on July 30, 2002, entered an order declaring that the Host Community Agreement became void as of November 1996.

## Defendant's Responsive Statements

15. The Host Community Agreement was executed between [Eagle I] and Chest Township. On July 30, 2002 the Court of Common Pleas of Clearfield County, the state Court having jurisdiction over contract matters in Clearfield County entered an Order, which was not opposed by the Plaintiff, declaring the Host Community Agreement void.

17. Under Mr. Valiknac's supervision, Eagle II constructed an entrance road at two locations, constructed two outfall headwalls and began the construction of a wetland replacement area.

18. Eagle II entered into an Excess Maintenance Agreement with Chest Township on November 9, 2002.

22. Jacques Khodara, the former owner of the general partner Khodara Environmental, Inc. testified that the main reason the Township gave for opposing the permit was the Harms & Benefit analysis [and added that the Defendant "did not recognize the agreement they had with us, in other words."] Document No. 123-2, p. 13.

## Plaintiff's Reply Statements

24. When the Plaintiff appealed Plaintiff's solid waste disposal permit to the Pennsylvania Environmental Hearing Board ("EHB") in September 2001, it wanted the EHB to revoke Plaintiff's permit.

6

25.   The Township's consistent and current position is that, despite this Court's May 24, 2005 opinion and order, the Host Community Agreement, Excess Maintenance Agreement, and Addendum are void.

26.   On at least two occasions during 1998 and 1999, the Township informed PaDEP of its position that Plaintiff had no agreements with the Township and that the Host Community Agreement, Excess Maintenance Agreement, and Addendum were ineffective and void.

## C.   **Analysis**

The Plaintiff's Motion for Partial Summary Judgment presents an issue of repudiation, otherwise known as an anticipatory breach. The Plaintiff believes that the actions of the Defendant evidence its repudiation of the Host Community Agreement, its Addendum and the Excess Maintenance Agreement, agreements originally entered into between the Defendant and Eagle I. On May 24, 2005, this Court entered a declaratory judgment in favor of the Plaintiff finding that these three instruments were not void for the Pennsylvania DEP's "denial of a permit to [Eagle Environmental L.P.] in 1996". Order of Court dated May 24, 2005 (Document No. 44).

On April 17, 2002, the Defendant filed a civil action in the Court of Common Pleas of Clearfield County at docket number "02-607 CD" seeking a declaratory judgment against Eagle I that would find that the Defendant's agreement with it was void because Eagle I's "permit was denied by the Pennsylvania Department of Environmental Protection [on] November 26, 1996, and that any subsequent attempt to assign a void permit was null, void, and of no legal effect." Document No. 110-6, p. 11. The agreement in issue is the June 11, 1994 "Host Community Agreement" (*See* Document

7

No. 100-6, p. 24). Defendant's Complaint (Document No. 100-6), ¶ 6. The Defendant claimed that the Host Community Agreement was void as well as unassignable under its terms. *Id.* ¶¶ 10, 15. After the Defendant's motion for default judgment was filed in the declaratory judgment action, Judge Reilly of the Court of Common Pleas of Clearfield County entered default judgment in the Defendant's favor against Eagle I on July 30, 2002 finding that the Host Community Agreement was void as of November 26, 1996. *See* Document No. 100-6, p. 22.

The Defendant steadfastly denies having ever repudiated the Host Community Agreement, arguing instead that it took a legal position with respect to the agreement and did not verbalize and act to repudiate the Host Community Agreement. Defendant's Brief (Document No. 109), pp. 9, 10. The Pennsylvania law on this matter supports this contention.

The controlling case in Pennsylvania concerning anticipatory breach is *2401 Pennsylvania Avenue Corp. v. Federation of Jewish Agencies of Greater Philadelphia*, 489 A.2d 733 (Pa. 1985). In *Federation*, the Pennsylvania Supreme Court reiterated the applicable standard originally set forth in the case of *McClelland v. New Amsterdam Casualty Co.*, 185 A. 198 (Pa. 1936) which found "that to constitute anticipatory breach under Pennsylvania law there must be 'an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so.'" *Federation* at 736 (*citing McClelland*, 185 A. 198, 200). Building upon the standard set forth in *McClelland*, the *Federation* Court found that an anticipatory breach did not occur when a lessee re-stated the advice of its attorneys as to the effectiveness of a lease and otherwise "declined to grant an extension [to a hold-over tenant] because 'they were being advised by their attorneys that any extension given by the Federation *would in essence, acknowledge the validity of the lease*'". *Federation* at 737. Additionally,

8

Federation's

> informing [Walnut] that 'the Federation did want to occupy [the four floors], had *no use* for it, and would *not consider any type of extension without a release*, of liability from the lease indicates that [Federation] did recognize at the very least a possible obligation under the contract. The fact that party seeks to preserve what it deems to be a legal defense to the required performance does not reflect an intention to deliberately breach the agreement. To the contrary, it reflects an intention to avoid performance only if there is a legal basis for the refusal or performance.

*Federation* at 737.

A review of the record reveals that the Defendant in the case *sub judice* has taken similar actions

and made similar statements which do not equate to any indication of repudiation. Of particular concern

for the Court is the characterization of the Defendant's declaratory judgment action filed against Eagle

I, which resulted in a default judgment that declared void the November 26, 1996 agreement between

the Defendant and Eagle I. Despite the fact that this action was filed by the Defendant against Eagle

I, which could equate to an affirmative action on the part of the Defendant, the nature of a declaratory

judgment is such that it was not sought to create an anticipatory breach, but to obtain a decree regarding

the rights and obligations of Eagle I and the Plaintiff:

> Where there is a dispute between two parties to a contract as to their rights and obligations under that contract, an appropriate and adequate legal remedy is available under the Declaratory Judgments Act.
>
> Under the Act, a contract may be construed either before or after there has been a breach of it. Thus, a party may pursue a declaratory judgment despite an unsuccessful damages claim.
>
> The power to construe contracts by a declaratory judgment has been referred to and exercised by the courts. For example, a declarative adjudication may determine the rights of the parties under a contract or the right of one party to terminate the contract. The declaratory judgment procedure also may be used to obtain an interpretation of a contract in order that a breach of contract resulting in an action for damages or the

9

imposition of a penalty may be avoided.

\*\*\*

An action for a declaratory judgment is available to determine the validity and enforceability of contractual provisions. The fact that one of the issues in the case may concern the propriety of awarding money damages in no way affects the viability of the declaratory judgment action.

Standard Pennsylvania Practice § 66:44 (footnotes omitted). The Defendant's declaratory judgment, obtained against Eagle I through a default judgment, is not indication or action equating to an anticipatory breach, but is only an act seeking a court to define the obligations of the parties as to the November 26, 1996 agreement. The same can be said for the Defendant's appeal to EHB of the PaDEP's granting of the permit. Furthermore, the statements attributable to the Defendant evidencing a belief that the contract is void are also not statements of repudiation. The Defendant has not repudiated the November 26, 1996 agreement. However, this conclusion does not equate to a finding that the judgment of the Court of Common Pleas of Clearfield County, rather than the Opinion and Order of this Court of May 24, 2005, controls the issue of whether the agreement was in fact void. Such matters are not addressed in Plaintiff's motion and are not before the Court. The Plaintiff's motion is denied.

## III. Defendant's Motion for Partial Summary Judgment

### A. Synopsis

The Defendant has moved for summary judgment in Counts II, V and VII of the Third Amended Complaint. Count II alleges a "Violation of the Dormant Commerce Clause" (TAC ¶¶ 39-41), Count V alleges that equitable estoppel should apply against the Township because of the

10

Plaintiff's reliance upon "the Township's representations with respect to its authorization for and approval of the Royal Oak Landfill." (TAC ¶ 48) and Count VII alleges a violation of the Pennsylvania Vehicle Code through the Defendant's enactment of weight restrictions for Township Routes T-409 and T-412 (TAC ¶ ¶ 56-59). The Plaintiff submits that its claim set forth in Count V "was rendered superfluous by Court's prior grant of partial summary judgment to [Plaintiff]." The Court therefore reads this statement as one of voluntary dismissal of Count V on the part of the Plaintiff. The Court now proceeds to analyze the arguments as to Counts II and VII.

The following are statements of undisputed material fact as submitted by the parties. Any facts not contained herein were either found to be immaterial, disputed or both. The original numbering of the facts is retained for the ease of referencing the parties' submissions.

## B.    Statement of Facts

### Defendant's Statements

1.    Highstar Royal Oaks I, Inc., (hereinafter "Highstar I") is the sole general partner of [Eagle II].

2.    Highstar I is incorporated under Delaware law.

3.    Eagle II is a limited partnership formed under Delaware law.

4.    Defendant, Chest Township (hereinafter "Township") is a Second Class Township in Clearfield County, Pennsylvania.

5.    Eagle II has an ownership interest in approximately 800 acres of land located in the

11

Township (hereinafter "property").

6. On February 18, 1992, the Township adopted an Ordinance captioned, "An Ordinance of the Township of Chest, Clearfield County, Pennsylvania, establishing Procedures, Standards, and Transportation, Collection and Storage of Solid Waste Within The Township of Chest" (hereinafter "Waste Ordinance"). A true and correct copy of the Waste Ordinance is attached hereto as Exhibit "E-1".

7. The Waste Ordinance provided *inter alia,* that persons seeking to develop and operate solid waste disposal facilities within the Township obtain a [registration certificate] from the Township.

8. On December 18, 1992, [Eagle I], filed an application with the Pennsylvania Department of Environmental Protection (hereinafter "PaDEP") for a permit to construct and operate a solid waste disposal facility.

9. On June 11, 1994, Eagle I entered into two written agreements with the township's Board of Supervisors....

10. Eagle I and the Township entered into a "Host Community Agreement," which authorized the development and operation of Royal Oak Landfill and which provided that Eagle I would use only certain township roads [that is T-409 and T-412 "for the purpose of heavy hauling to and from the Premises." Document No. 100-6, 30].

11. Pursuant to the Host Community Agreement, Eagle I paid...$15,000.00 to the Township and agreed to pay the Township $2.00 per ton of waste disposed of at the landfill.

12

12. Eagle I and Township also entered into an "Excess Maintenance Agreement," which provided that Eagle I would repair any damage to the roads caused by truck traffic.

13. On June 11, 1997, Eagle I assigned certain rights and interests to Eagle II. The assignment was made without prior notice to the Township.

14. On August 9, 1997, the Township adopted an Ordinance captioned, "AN ORDINANCE OF THE TOWNSHIP OF CHEST, CLEARFIELD COUNTY, PENNSYLVANIA IMPOSING RESTRICTIONS AS TO THE WEIGHT OF VEHICLES OPERATING UPON THE TOWNSHIP ROADS; PROVIDING FOR THE ISSUING OF SPECIAL PERMITS FOR MOVEMENT OF VEHICLES OF WEIGHTS IN EXCESS OF MAXIMUM WEIGHT ESTABLISHED; AND PRESCRIBING PENALTIES FOR VIOLATIONS"(hereinafter "Weight Limit Ordinance").

15. The Weight Limit Ordinance established, *inter alia*, maximum weight limits allowed for certain roads within the Township.

16. The Weight Limit Ordinance was adopted as a result of studies done by the Pennsylvania Department of Transportation in 1982 and 1985.

17. The Weight Limit Ordinance [was drafted] to achieve consistency with PennDOT's regulations and PennDOT publication 221.

18. The traffic studies conducted by PennDOT [in 1982 and 1985] for the Township roads pre-dated any knowledge on the part of the Township officials that there ever would be an application for a landfill in Chest Township.

13

19. There are many coal and timber operations in Chest Township.

20. Most of the Township's roads are older and are secondary roads....

21. The Weight Limit Ordinance requires the posting of a bond which will be returned if the road is maintained.

22. The Weight Limit Ordinance requires the posting of a bond [as the Board of Supervisors deems necessary].

24. The Weight Limit Ordinance...prevents the Township residents from having to pay for damage done to roads by commercial users.

26. Vehicles exempted from the weight limit restrictions of the Weight Limit Ordinance included school buses, emergency vehicles, and vehicles making local deliveries or pickups.

28. On December 31, 1997, the Township issued a Registration Certificate to Eagle II, which authorized the construction and operation of Royal Oak Landfill upon the issuance of a permit to Eagle II by the PaDEP.

29. On September 12, 1998, the Township adopted the Quality of Life Ordinance with [the express purposes "set forth in Section 101 of that ordinance." Plaintiff's Counter-Statement No. 29 (Document No. 113) p. 7.]

30. The Anti-Dumping Ordinance was enacted on November 14, 1998, and [states in part that "[i]t shall be unlawful for any person] to accumulate, dump, deposit, or dispose, or

14

permit the accumulation, dumping, deposit or disposal of garbage, solid waste, and other refuse materials upon any private or public property...within the Township"

31.    The Anti-Dumping Ordinance also makes [it] unlawful for any person "to dispose any solid waste from sources located within the Township except by a hauler licensed by Clearfield County...."

32.    The Anti-Dumping Ordinance was written by Jody Brennan of the Clearfield County Solid Waste Authority and adopted by the Township without change or alteration.

34.    Many of the municipalities in Clearfield County have also passed anti-dumping Ordinances similar or identical to the Chest Township Ordinance.

38.    The Anti-Dumping Ordinance has never been enforced in any manner against the Plaintiff.

39.    The Anti-Dumping Ordinance has been applied even-handedly by Chest Township without exception.

40.    On August 3, 2001, the PaDEP issued a solid waste disposal permit to Eagle II which authorized Eagle II [to] construct and operate the Royal Oak Landfill.

41.    On June 13, 2002, the Quality of Life Ordinance was repealed.

42.    The Quality of Life Ordinance was never applied in any manner to the Plaintiff in this case prior to its repeal.

43.    On August 3, 2006, Eagle II's solid waste disposal permit issued by PaDEP became

15

void because "no residual waste was processed or disposed under [the] permit within 5 years of the date of issuance."

44.    On March 20, 2007, the Township repealed the Waste Ordinance.

45.    The only application or enforcement of the Waste Ordinance to Plaintiff prior to its repeal was that Plaintiff applied for and was granted a certificate of registration.

46.    Plaintiff has never been denied access to the landfill.

47.    On one occasion, Defendant assisted two...trucks which were headed to the landfill site from becoming unstuck on a snowy night.

**Plaintiff's Responsive Statements**

48.    In July 17, 1997, Eagle II applied to the [PaDEP] for a permit to construct a landfill in the Township.

49.    On July 17, 1997, Eagle II provided the Township with a copy of its application for a permit to construct and operate a landfill in the Township.

53.    Pursuant to a series of written agreements with the Township, Eagle II stated in its application that it would use Township roads to access the landfill.

54.    Eagle II received its disposal permit in August 2001.

56.    By the fall of 2005, Eagle II recognized that it would not be able to meet the August 2006 deadline for the construction and operation of its landfill.

57.    The disposal permit lapsed in August 2006....

16

59.    In August 1997...the Township enacted the Weight Limit Ordinance by which it placed
       a 10-ton weight limit on certain Township roads, including the two roads Eagle II
       planned to use.

60.    Residual waste typically originates from jobs where a truck is filled completely and then
       travels to the disposal site. A single large truck can carry the same load, and thus
       generate the same revenue, as two or three smaller trucks. As a result, when loaded and
       traveling to the landfill, trucks transporting residual waste generated outside of
       Pennsylvania for disposal at a landfill in Chest Township will typically weigh more than
       10 tons when loaded.

65.    The Township has admitted that logging companies and mining companies haul loads
       greater than 10 tons over Township roads.

66.    The Township knew that any disposal permit Eagle II obtained would lapse five years
       after issuance if Eagle II did not open the landfill before then.

67.    In September 2001, the Township appealed Eagle II's disposal permit.

68.    On [August][1] 2, 2005, Eagle II applied to PaDEP to renew or extend its disposal permit.

69.    PaDEP refused to renew or extend Eagle II's disposal permit.

70.    With support from the Township as an intervenor in opposition to Eagle II, PaDEP
       prevailed when Eagle II sought relief from the [EHB] with respect to PaDEP's decision
       not to renew or extend Eagle II's disposal permit.

---

[1]*See* Document 113-4, p. 6.

17

71. The Environmental Hearing Board determined that:

> There is no question about the Township's opposition to the landfill. In its appeal from the issuance of the original permit, the Township claimed that the permit should not have been issued because, among other things, it was not clearly to the benefit of the Township, there was no legal Host Community Agreement between [Eagle II] and the Township and [Eagle II] had no right to use Township roads.

> In addition, the township had obtained a declaratory judgment from the Court of Common Pleas of Clearfield County that the Host Community Agreement between [Eagle II] and the township was void.

72. In January 1999, the Township wrote to the Governor of Pennsylvania and asked him to help "stop unwanted out-of-state trash." The Township said that it had secured a commitment from a local state representative to "take every step necessary to stop the unnecessary placement of out-of-state trash within our township." The Township then complained that it had endured "cost and inconvenience" and reiterated its hope that the Governor would share its view regarding the need to block out-of-state waste.

73. In June 2007, a Township supervisor, testifying as a Rule 30(b)(6) designee of the Township, when asked the Township's position regarding the origins of waste to be disposed of at the landfill, stated: "We should feel that it should be all in-state garbage." Then, asked to clarify, the supervisor said, "We would just prefer that it was all in-state garbage."

74. On June 14, 1997, the Township took steps to enact the Weight Limit Ordinance at the same public meeting during which it discussed Eagle II's decision to apply for a permit to construct and operate a landfill in the Township.

75. There is no mention of the 1985 studies that the Township purportedly relied upon when

it adopted the Weight Limit Ordinance in 1997, or any other studies, in the minutes of the June 14, 1997, Township meeting during which the Weight Limit Ordinance was discussed.

77. As of June 4, 2007, it was the Township's position that it did not have copies of the studies that it purportedly relied upon when it adopted the Weight Limit Ordinance in 1997.

79. Eagle II could not comply with the setback requirements of section 302 of the Quality of Life Ordinance and construct and operate the landfill proposed in its July 1997 application.

80. Using only materials in the July 1997 permit application, it is possible to determine that the landfill, as proposed, would violate the setback requirements of section 302 of the Quality of Life Ordinance.

**Defendant's Reply Statements**

1. On its facility plan for residual waste facility submitted to PaDEP as part of its permit application, Eagle II described its proposed facility as one which "will service industries located in central and western Pennsylvania."

2. Eagle II listed as a need for its facility that the "proposed landfill will be designed and permitted in a timely fashion so that they [sic] are ready to accept the residual waste that continues to be generated in the Commonwealth."

3. As of May 19, 2003, Eagle II did not have any contracts to dispose of waste [from] outside of Pennsylvania.

19

4.    Defendant incorporated the 10-ton weight limit recommended by PennDOT in its 1982 and 1985 studies into its bonding procedures in 1985.

5.    The Township has entered into an excess maintenance agreement with a coal company in the past. Coal companies were required to enter into excess maintenance agreements with the Township if their use of township roads exceeded a certain number of vehicles traveling on them, a number which is determined by surveys conducted by PennDOT.

6.    25 Pa.Code § 287.211(e), concerning the amount of time before a permit expires after [it] is issued, was not a factor in the Township's decision to take an appeal of Eagle II's solid waster [sic] permit and such appeal was not designed to stop construction of the landfill.

## C.    Analysis

The Defendant moves for summary judgment as to Counts II, V and VII of the Third Amended Complaint.

### 1.    Count II

Count II sets forth a claim for a violation of the dormant Commerce Clause. At the center of the debate on this issue are two ordinances, the Quality of Life Ordinance and the Weight Limit Ordinance, which were enacted by the Defendant and are alleged to have affected the flow of interstate commerce as it was engaged in or attempted to be engaged in by the Plaintiff.[2] The Plaintiff concedes

---

[2]Although the Defendant addresses four ordinances in its motion, the Quality of Life Ordinance, enacted on September 12, 1998 and repealed on June 13, 2002, the Solid Waste Ordinance, enacted on September 12, 1998 and repealed on March 27, 2007, and the Weight Limit Ordinance, enacted on August 9, 1997 and the Anti-Dumping Ordinance enacted on November 14, 1998 (both still in effect in Chest Township), the Plaintiff concedes that only the Quality of Life and the Weight Limit Ordinances are the subject of its claims at Count II. See Plaintiff's Brief (Document No. 112), p. 2

that the Weight Limit Ordinance is not facially discriminatory, but argues that the Quality of Life ordinance is facially discriminatory as well as discriminatory in its purpose and effect. Plaintiff's Brief, p. 5, 12-18.

The two ordinances present an issue concerning the "dormant" or " negative" Commerce Clause. As set forth in Article I, Section 8, cl. 3 of the Constitution, the Commerce Clause reads: "The Congress shall have Power...to regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes". Although this language grants to the federal government the express power to regulate interstate commerce, it has also been interpreted to have placed restrictions upon the "several States" in the manner with which they regulate interstate commerce:

> Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a "negative" aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce. *See, e.g., Wyoming v. Oklahoma*, 502 U.S. 437, 454, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992); *Welton v. Missouri*, 91 U.S. 275, 23 L.Ed. 347 (1876). The Framers granted Congress plenary authority over interstate commerce in "the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325-326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979). *See generally* The Federalist No. 42 (J. Madison). "This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, ... has as its corollary that the states are not separable economic units." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 537-538, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949).

*Oregon Waste Systems, Inc. v. Department of Environmental Quality of State of Or.*, 511 U.S. 93, 98-99, 114 S.Ct. 1345,1349 - 1350, 128 L.Ed.2d 13, 20-21 (1994). *See also Tolchin v. The Supreme Court of the State of New* Jersey, 111 F.3d 1099, 1106 (3d Cir. 1997).

---

n. 3.

When discrimination against interstate commerce is proven to be the result of a law's "purpose or effect", a heightened scrutiny applies in a court's evaluation of that law, and the burden then shifts to the state to prove that "the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means."

*Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Marketing Bd.*, 462 F.3d 249, 261 (3d Cir. 2006)(citations omitted). *See also Atlantic Coast Demolition and Recycling Inc. v. Board of Chosen Freeholders of Atlantic County*, 112 F.3d 652, 662 (3d Cir. 1997). A facially discriminatory law will also trigger heightened scrutiny under the dormant commerce clause. *Tolchin* at 1107. However, in the absence of discrimination by the law in issue, courts must apply a balancing test set forth in *Pike v. Bruce Church, Inc.* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970):

Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443, 80 S.Ct. 813, 816, 4 L.Ed.2d 852. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach in resolving these issues, *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915, but more frequently it has spoken in terms of 'direct' and 'indirect' effects and burdens. *See, e.g., Shafer v. Farmers Grain Co., supra*.

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174, 178-179 (1970).

Prior to commencing separate analyses of the alleged discriminatory nature of the Quality of Life Ordinance and the Weight Limit Ordinance under the dormant Commerce clause, an issue of possible mootness exists separate and apart from the constitutional issue in Count II. Specifically, the Plaintiff's requested equitable relief as to Count II may not be available to the Court.

The Defendant seeks entry of summary judgment as to the Plaintiff's claims for equitable relief under the Declaratory Judgment Act regarding the allegation that the Defendant violated the dormant Commerce Clause. The Plaintiff prosecutes its dormant Commerce Clause claim through 42 U.S.C. § 1983. It has been recognized that the dormant Commerce Clause establishes rights that are cognizable under 42 U.S.C. § 1983. *Dennis v. Higgins*, 498 U.S. 439, 447-451, 111 S.Ct. 865, 870-872, 112 L.Ed.2d 969 (1991).

The Declaratory Judgment Act preserves the right to a jury trial for those actions that seek a legal remedy, but no right to a jury trial exists as to those claims that are equitable in nature. *See Owens-Illinois Inc., v. Lake Shore Land Co., Inc.,* 610 F.2d 1185, 1189-1190 (3d Cir. 1979). The Plaintiff's claims seek mixed relief: 1) a general claim for damages that apparently relates to the application of 42 U.S.C. § 1983 damages law to the alleged violation of the dormant Commerce Clause and the breach of contract claim analyzed in Section I, *supra*; and 2) a claim for equitable relief from the Defendant's alleged violations of the dormant Commerce Clause and the violation of Pennsylvania's Vehicle Code that specifically seeks declarations from this Court that the Defendant's ordinances are unconstitutional and that the weight limits are invalid under Pennsylvania law and an injunction against the Defendant from enforcing such ordinances. TAC, pp. 8-9. This Court previously decreed the validity of the assignments of the agreements between Eagle I and Eagle II. The Court will review each of the ordinances separately, preliminarily addressing the possible mootness for the equitable relief sought as to each ordinance and then the constitutional challenge as to each ordinance. The Quality of Life Ordinance is examined first.

23

## a. **The Quality of Life Ordinance**

The Defendant argues that the Quality of Life Ordinance was never enforced against the Plaintiff and was since repealed on June 13, 2002. Defendant's Brief (Document No. 105), pp. 6-7. The Defendant specifically argues that the Quality of Life ordinance was never applied to the Plaintiff and it did not otherwise "burden...interstate commerce" and therefore did not prevent the Plaintiff's goal of developing and operating the landfill. Defendant's Brief, pp. 6-7.

The failure to apply the Quality of Life Ordinance and its subsequent repeal moots the Plaintiff's request for injunctive relief as to a violation of the dormant Commerce Clause. Furthermore, the repeal of the ordinance five years ago presents a situation where the need for a declaratory judgment is not warranted as no "actual controversy" exists as mandated "by Article III of the Constitution and the express terms of Federal Declaratory Judgment Act...." *Steffel v. Thompson*, 415 U.S. 452, 458-460, 94 S.Ct. 1209, 1215-1216, 39 L.Ed.2d 505, 514-515 (1974). The Court sees nothing of record that indicates that the Quality of Life Ordinance will be enacted again and enforced against the Plaintiff. While the Court agrees that the Plaintiff's citation of *Waste Management Holdings Inc v. Gilmore*, 252 F.3d 316, 332-333 (4th Cir. 2001) presents an understanding that a party's standing still exists in situations where harm is prospective, *see* Plaintiff's Brief, pp. 17-18, it does not support the continued viability of declaratory action where the prospect of harm is non-existent. Although it appears that this dormant Commerce Clause claim was ripe as to the Quality of Life Ordinance at the time of the commencement of this civil action, the repeal of the ordinance has established its mootness. The Court cannot enter a declaratory judgment in favor of either party on this issue as no "actual controversy"

24

exists on this matter. *Korvettes, Inc. v. Brous*, 617 F.2d 1021 (3d Cir. 1980). Additionally, any potential claim by the Plaintiff for injunctive relief under § 1983 rather than the Declaratory Judgment Act, has also become moot in light of the repeal of the Quality of Life Ordinance. *See Johnson v. Miller*, 925 F.Supp. 334, 337 (E.D.Pa. 1996).

The possibility that attorneys fees under 42 U.S.C. § 1988 may be awarded does not "create an Article III case or controversy where none exists on the merits of the underlying claim...." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 480-481, 110 S.Ct. 1249, 1255, 108 L.Ed.2d 400, 413 (1990). However, Lewis' claims were declaratory and injunctive in nature and did not involve monetary claims. *Lewis* at 475, 110 S.Ct. at 1262, 108 L.Ed. 2d 400, 409. In the case *sub judice*, the Plaintiff has mixed claims for equitable and legal relief in this instance. The Declaratory Judgment Act is a not an independent basis for subject matter jurisdiction in a United States District Court. *See Federal Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 351-352 (3d Cir. 1986), *Cutaiar v. Marshall*, 590 F.2d 523, 527 (3d Cir. 1979) and *Ragoni v. United States*, 424 F.2d 261, 264 (3d Cir. 1970). However, 42 U.S.C. § 1983, while "not itself a source of substantive rights", "provides a cause of action for the vindication of federal rights." *Rinker v. Sipler*, 264 F.Supp.2d 181, 186 (M.D.Pa. 2003). With 42 U.S.C. § 1983 providing the cause of action, and 28 U.S.C. § 1343 (although not cited by the Plaintiff) providing the subject matter jurisdiction for the § 1983 claim, the remedies possible are those set forth under § 1983 and the Declaratory Judgment Act. In the absence of a cause of action under § 1983, the Plaintiff will be without the ability to attain declaratory or injunctive relief. *Glancy v. Parole Board of Michigan Dept. Of Corrections*, 287 F.Supp 34, 36 (W.D.MI. 1968). Without a "live controversy" in which to base any equitable relief, what remains of the Plaintiff's § 1983 claim for violation of the dormant

25

Commerce Clause based upon the enactment of the Quality of Life Ordinance is a legal claim for

monetary damages.

Proceeding to the facial analysis of the Quality of Life Ordinance for a violation of the dormant

Commerce Clause, the Court finds evidence that the express terms of this ordinance set forth in section

404(6) of the ordinance present minimal basis for a finding of facial discrimination under the dormant

Commerce Clause. Section 404(6) of the Quality of Life Ordinance reads:

> Applicant shall demonstrate and provide sufficient evidence to the township that
> all generators of refuse or solid waste being disposed of, treated, stored, transferred or
> incinerated at the facility are involved in source reduction programs whose stringency
> is equal to or greater than any existing county, state or federal law and that the facility
> proposed by the applicant is authorized by the approved Act 101 plan for the county in
> which it is located. In the event that generators of waste to be treated, stored,
> transferred, disposed of or incinerated at this facility are not subject to source reduction
> by any regulatory agency, applicant shall demonstrate to the township that the generators
> are engaged in source reduction activities consistent with the Hazardous Waste Facility
> Plan promulgated pursuant to the Pennsylvania Solid Waste Management Act and
> Hazardous Sites Cleanup Act, and shall set forth specifically and with particularity for
> each generator the mechanism by which source reduction, reuse, recycling, recovery or
> treatment have been implemented prior to ultimate treatment, storage, disposal or
> incineration at this site. [A]pplicant shall also demonstrate, as part of its application, that
> disposal or incineration at this site is necessary and that all other disposal alternatives
> have been explored and are not feasible, and will only occur after all wastes have been
> stabilized.

While this section of the ordinance presents application of Pennsylvania law to applicants seeking to

dispose of waste generated outside of Pennsylvania, the language itself is still not discriminatory toward

out-of-state waste and those who dispose of it. Unlike the statute in *City of Philadelphia v. New Jersey*,

437 U.S. 617, 625, 98 S.Ct. 2531, 2536, 57 L.Ed.2d 475, 482 (1978), which had an express purpose

"that the treatment and disposal within [New Jersey] of all wastes generated outside of the State be

prohibited", this ordinance presents no express discrimination in its terms. Therefore, the Court finds that the ordinance does not present any discrimination on its face and our analysis must proceed to considering any discriminatory purpose or effect accompanying the ordinance.

The evidence of record easily establishes issues of material fact concerning the purpose of the Quality of Life Ordinance. The language of the ordinance when viewed with the undisputed material facts supports the argument that the Defendant's enactment of the ordinance was a result of an intent to discriminate against the Plaintiff, who the Defendant believed would attempt to dispose of solid waste and residual waste generated outside of Pennsylvania. In addition, despite the fact that the ordinance does not identify the Plaintiff or any non-Pennsylvania waste disposal operation, the ordinance requires the Township's Board of Supervisors to deny applications made under the ordinance should the application meet public opposition: "Should the supervisors determine that the health, safety and welfare of the citizens of the township, or the rights guaranteed under Article I § 27 [of the Pennsylvania Constitution] could be adversely affected, *or that the residents, citizens and taxpayers of the Township object to the operation of the site or facility the supervisors shall deny the application for a license.*" Quality of Life Ordinance § 405 (Document No. 103-7), p. 21 (emphasis added). Furthermore, Section 408 of the ordinance reads in pertinent part: "This Ordinance supersedes any prior action of the Township related to the applicant and *applicant, by applying for a license, waives any challenge to this Ordinance based upon any prior Ordinance or agreement between that applicant and Township.*" *Id.* § 408, p. 22. (emphasis added).

The undisputed facts reveal that Eagle I assigned to the Plaintiff interests in three agreements

27

made between Eagle I and the Defendant, including the Host Community Agreement, and that assignment took place on June 11, 1997 without notification to the Defendant; on July 17, 1997, the Plaintiff applied to the PaDEP for a permit to construct a landfill and sent a copy of the application to the Defendant on the same day, USOMF 48, 49 p.16; Defendant "authorized the construction and operation of [the landfill]" on December 31, 1997, USOMF 28, p. 14, the Quality of Life Ordinance was adopted on September 12, 1998, USOMF 29, p. 14, the terms of which include waiver of "any challenge to [the Quality of Life Ordinance] based upon any prior ...agreement between that applicant and Township." *Supra*, p. 27. Mr. Michael's statements regarding the origin of the waste present relevant evidence of the possible context in which the township was acting. USOMF 73, p. 18. Additionally, it is undisputed that the Plaintiff's plans for construction as set forth in 1997 could not comply with the setback requirements of the ordinance passed in 1998. USOMF 79, 80, p. 19. Although it is undisputed that "[a]s of May 19, 2003, Eagle II did not have any contracts to dispose of waste [from] outside of Pennsylvania" USOMF 3, p. 19, it remains in dispute whether it was the intent of the Plaintiff to process waste solely generated in Pennsylvania, or process waste generated from inside as well as outside of Pennsylvania. Nevertheless, the undisputed facts present strong factual support for the Plaintiff's claims and the facts that remain in dispute must be presented to a jury. The Defendant's motion is denied as to the Quality of Life Ordinance.

### b. The Weight Limit Ordinance

In contrast to the Quality of Life Ordinance, the Weight Limit Ordinance does present an "active controversy" under 28 U.S.C. § 2201 as it remains an operative ordinance within Chest Township in

28

addition to the fact that the bonding requirements of a $10,000.00 bond have been and are applied to the Plaintiff. Therefore, the request for declaratory relief is not moot as to this ordinance.

In support of its motion, the Defendant argues that the Weight Limit Ordinance was based upon traffic studies conducted by PennDOT in 1982 and 1985, that such studies concluded that a 10 ton weight limit should be imposed for the roads studied including township roads T-409 and T-412, that the studies "predated any knowledge on the part of the township officials that there ever would be an application for a landfill in Chest Township", that the Defendant had in place a weight limit ordinance prior to the present ordinance's enactment and that the Weight Limit Ordinance was enacted pursuant to the Pennsylvania Vehicle Code, specifically 75 Pa.C.S.A. § 4902(a). Defendant's Brief, pp. 8-9. Additionally, the Defendant argues that "the local benefits provided to the Township by the Weight Limit Ordinance clearly outweigh any burden imposed on interstate commerce", that only "the bond procedure" of the ordinance was applied to the Plaintiff and that "inbound waste" is not discriminated against under the ordinance. Defendant's Brief, pp. 9-10.

However, the Plaintiff views the facts differently. It is the Plaintiff's contention that the Weight Limit Ordinance is the vehicle through which the Defendant can still exact certain requirements and actions from the Plaintiff in the absence of the Quality of Life Ordinance. Plaintiff's Brief, p. 19. The Plaintiff argues that the Weight Limit Ordinance was enacted with a discriminatory purpose and otherwise has a discriminatory effect. Plaintiff's Brief, p. 12. As to discriminatory purpose, Eagle II argues that the Defendant "believed that most of the waste to be disposed at the landfill would come from out-of-state." Plaintiff's Brief, p. 14. In addition to the comments and correspondence already

29

of record that support this argument, the Plaintiff references the timeline of events from enactment of the ordinance, *see* USOMF 73, p. 18, no reference to the 1985 studies at the Township supervisors' meeting in which the ordinance was enacted, USOMF 75, p. 18-19, and the fact that the Defendant did not have copies of the studies when it adopted the ordinance in 1997, USOMF 77, p. 19. The Plaintiff also argues that other companies, that are logging and coal interests, operating within the Township have not been subject to the Weight Limit Ordinance, as they exported their products, rather than imported them like the Plaintiff. Plaintiff's Brief, pp. 15-16. Additionally, the Plaintiff cites the noted opposition through words and legal actions that the Defendant has expressed with regard to the operation of the landfill and the disposal of out-of-state waste. *Id.* at p. 16; USOMF 72, p. 18. In light of these arguments, the Plaintiff believes that an issue of material fact exists and that this matter should proceed to trial as to the Weight Limit Ordinance. The Court agrees.

These undisputed material facts relevant to the adoption of the Weight Limit Ordinance, similar to the facts concerning the adoption of the Quality of Life Ordinance, support a theory that the Defendant sought to specifically regulate the importation of waste into the Township. The ordinance obviously applies to the vehicles transporting waste within the Township. Although the Township takes the position that the Weight Limit Ordinance replaced a previous ordinance of similar character, Defendant's Brief, p. 9, that previous ordinance has not been produced on the record and the 1985 studies were undisputedly not available to the Township at the time of the enactment of the Weight Limit Ordinance (see USOMF 77, p. 19). Moreover, discussion of enacting this ordinance began after the Township became aware in the same meeting on June 14, 1997 that the Plaintiff would seek " a permit to construct and operate a landfill in the Township." *See* USOMF 74, p. 18. Despite the fact that

30

the ordinance was consistent with PennDOT policies, USOMF 17, p. 13, it was enacted on August 9, 1997, 12 years after the 1985 studies were conducted and fifteen years after the 1982 studies were completed. Therefore, these undisputed facts support the Plaintiff's theory that the Defendant had a discriminatory purpose in enacting the Weight Limit Ordinance and summary judgment must be denied on this issue.

On its argument that the Weight Limit Ordinance is discriminatory, the Plaintiff argues that despite its facial neutrality, the ordinance was used by the Defendant to exact "commitments" from the Plaintiff pursuant to the excess maintenance agreement, commitments that would increase costs but are not required of other businesses, specifically intrastate businesses. Plaintiff's Brief, pp. 17-18. The Court cannot conclusively state that the facts support summary judgment. While the Plaintiff believes that commitments above and beyond the express terms of the Weight Limit Ordinance are a condition of complying with this ordinance, the facts remain disputed. Conflicting statements in the record thus cause the Court to conclude that it cannot accept Proposed USOMF 64, as undisputed. Mr. Michael's testimony in particular presents confusion on the effect of the Weight Limit Ordinance upon the Plaintiff and thus the matter remains disputed and summary judgment must be denied as to this argument as well.

Prior to concluding this portion of the analysis, the Court briefly will address the Defendant's contention made in its Reply Brief (Document No. 118) at pages eight and nine that it cannot be liable under 42 U.S.C. § 1983. There is no issue for the failure to train employees in this instance, but a municipal ordinance is clear evidence of an official policy that may violate a Constitutional right.

31

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298-1299, 89 L.Ed.2d 452, 463 (1986). To the extent that it is argued the Quality of Life Ordinance was never enforced, such a fact presents an issue of damages for the reason that a violation of a constitutional right is a sufficient action to garner nominal damages in the absence of actual damages. As the Third Circuit has found:

> Generally, "damages are available under[§ 1983] for actions 'found ... to have been violative of ... constitutional rights and to have caused compensable injury.' " *Carey v. Piphus*, 435 U.S. 247, 255, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (internal quotations, citations, and emphasis omitted). However, "substantial damages should be awarded only to compensate actual injury." *Id.* at 266, 98 S.Ct. 1042. Where a constitutional deprivation has not caused actual injury, an award of nominal damages may be appropriate. *See id.* But nominal damages may only be awarded in the absence of proof of actual injury. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n. 11, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) ( "[N]ominal damages ... are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury."); *Carey*, 435 U.S. at 248, 266-67, 98 S.Ct. 1042 (approving recovery of nominal damages without proof of actual injury).

*Pryer v. C.O. 3 Slavic,* 251 F.3d 448, 453 (3d Cir. 2001). Thus, the § 1983 claims made in Count II can produce a recovery for the Plaintiff should a jury find a violation of a Constitutional right.

Therefore, because of the viable evidence supporting the Plaintiff's theory of discrimination within the purpose or effect of the Quality of Life Ordinance and the Weight Limit Ordinance, but not from a facial challenge to the ordinances, the Court does not proceed further to analyze the ordinances under the balancing test of *Pike Church*. The Court finds that proceeding with such an analysis without first conclusively establishing that the ordinances are not discriminatory in purpose or effect would be premature. The next issue is the statutory validity of the Weight Limit Ordinance as challenged in Count VII.

## 2.    Count VII

Count VII sets forth a claim based upon a violation of the Vehicle Code of Pennsylvania. Namely, the Plaintiff attacks the evidence set forth in support of the Defendant's Motion with respect to enactment of the Weight Limit Ordinance. The Court considers the affidavit of Mr. Michael in accordance with the Memorandum Opinion and Order of Court dated October 26, 2007. The Court will not discuss again those matters resolved in that Memorandum Opinion, but that were addressed again in the Plaintiff's brief. To the extent that the Plaintiff challenges the fact that the Defendant did not possess the engineering studies from 1982 and 1985 on June 4, 2007 and therefore such records were not kept in the ordinary course of business, such a conclusion cannot be made. The Court is without evidence of the document retention practices of the Defendant or the possibility that such studies were accidentally eliminated. Furthermore, any challenge to the completeness of the weight limit studies produced generates issues of material fact. Such matters are fodder for cross-examination at trial and merit no further discussion here. As the Court's analysis will demonstrate, an issue of material fact exists separate and apart from these evidentiary issues.

The Court recognizes the thrust of the Plaintiff's claim in Count VII is that the engineering studies from 1982 and 1985 could not legally have been used and should not have been professionally relied upon as bases for the Weight Limit Ordinance. Plaintiff's Brief, pp. 20-24. The Defendant holds true to its position that the ordinance was enacted in compliance with 75 Pa.C.S.A. § 4901, § 4902, PennDOT Publication 221 and Title 67 of the Pennsylvania Code. Defendant's Brief, pp. 14-15. The Defendant thus seeks summary judgment as to this issue.

Before proceeding, the Court must first clarify the nature of the Plaintiff's cause of action on

33

this issue. The Plaintiff does not cite to a recognizable federal or Pennsylvania cause of action, either recognized under statute or under common law. However, the relief requested by Plaintiff as to Count VII is for the Court to "[d]eclare the weight limit restrictions imposed by the Township on Routes [T-]409 and [T-]412 to be invalid and enjoin the Township from requiring Eagle II to comply with such limits." TAC, ¶ 59(e). Count VII itself alleges that "[t]he Township imposed the weight limit restrictions on Routes [T-]409 and [T-]412 without complying with the [Pennsylvania] Vehicle Code and regulations promulgated thereunder." TAC, ¶ 58. The Plaintiff in its brief specifically argues that 75 Pa.C.S.A. §§ 4902(a) and 6109(e) essentially require current engineering studies to be conducted before routes, such as T-409 and T-412, are posted with weight limits and the bonding for certain vehicles traveling those routes can occur. Plaintiff's Brief, pp. 20-21. Accordingly, the Plaintiff argues that studies from 1982 and 1985 cannot be considered as proper support for enactment of the ordinance in 1997 as there is no guarantee they are "valid, accurate and current as of 1997." *Id.* at p. 21. The Plaintiff further argues that according to its engineering expert, "it would amount to professional malpractice to rely on a twelve year old study when making professional judgments regarding the need for weight limits." *Id.* at p. 21. Finally, the Plaintiff refers to the former 67 Pa.Code § 201.81(b), now reserved, that set forth the requirements for engineering studies that were to be conducted, specifically requiring certain conditions "exist" before weight restrictions could be placed and argues that studies at least twelve years in age could not satisfy this regulation. *Id.* at pp. 21-22.

It is clear that the Plaintiff is seeking declaratory relief in relation to its rights as affected by the Weight Limit Ordinance. Such declaratory relief is available for Pennsylvania statutes and regulations

34

through the Declaratory Judgments Act, 42 Pa.C.S.A. §§ 7531-7541 and the Court will consider the

Plaintiff's claim at Count VII as one seeking declaratory relief under that section. It is noted that the

necessary township, Chest Township, is the Defendant in this matter and as such, 42 Pa.C.S.A. § 7540

(relating to municipality as a necessary party when validity of municipal ordinance in issue) is satisfied.

This Court has subject matter jurisdiction of this state law claim pursuant to 28 U.S.C. § 1367(a).

It must first be recognized that the two statutes referred to by the Plaintiff, 75 Pa.C.S.A. §§

4902(a) and 6109(e) were different in substance in 1997. In 1997, they read in pertinent part:

**(a) Restrictions based on condition of highway or bridge** – the Commonwealth and local authorities with respect to highways and bridges under their jurisdictions may prohibit the operation of vehicles and may impose restrictions as to the weight or size of vehicles operated upon a highway or bridge whenever they determine that the highway or bridge may be damaged or destroyed unless use by vehicles is prohibited or the permissible size or weight of vehicles is reduced. School buses, emergency vehicles and vehicles making local deliveries or pickups may be exempted from restrictions on the use of highways imposed under this subsection.

75 Pa.C.S.A. § 4902(a)(1997).

**(a) Enumeration of police powers.** – The provisions of this title shall not be deemed to prevent the department on State-designated highways and local authorities on streets or highways within their physical boundaries from the reasonable exercise of their police powers. The following are presumed to be reasonable exercises of police power:
\*\*\*

(7) Prohibiting or restricting the use of highways at particular places or by particular classes of vehicles whenever the highway or portion of the highway may be seriously damaged by the use or the movement of the vehicles would constitute a safety hazard.
\*\*\*

**(b) Action by local authorities.** – Action taken by local authorities under this section

shall be:

(1) by ordinance of the local governing body; or

35

(2) by a commission or public official authorized to act on specified matters.

\*\*\*

**(e) Engineering and traffic investigation required.** – Action by local authorities under this section shall be taken only after completing an engineering and traffic investigation when and in such manner as required by regulations promulgated by the department.

75 Pa.C.S.A. § 6109 (1997). A review of these statutes limits our focus to § 6109 and discredits any

argument of the Plaintiff that § 4902 played a role in requiring engineering and traffic studies in 1997.

As the Plaintiff noted in its brief, the relevant regulation as to the engineering and traffic studies,

67 Pa.Code § 201.81, is no longer in effect. However, that regulation was effective on August 9, 1997,

the date of the enactment of the ordinance and read in pertinent part:

## § 201.81 Restrictions as to weight or size based on condition of highway or bridge.

(a) *Elements of engineering and traffic study.* The following elements shall be considered, as applicable, in every engineering and traffic study pertaining to restrictions as to the weight or size of vehicles based on the conditions of a highway or bridge:

(1) Geometric review – roadway width, vertical and horizontal clearance, turning radii, underclearance.

(2) Past experience – highway breakup.

(3) Pavement analysis.

(4) Structural analysis.

(5) Traffic speeds.

(6) Traffic volume – average daily traffic, peak hour, kinds and classes.

(b) *Criteria.* Traffic on a highway or bridge, regardless of age or condition, may be prohibited or restricted by weight or size of vehicle when one or more of the following exist:

\*\*\*

(5) When the highway pavement or shoulders have been weakened due to deterioration, high traffic volume or climactic condition, and a pavement analysis or engineering judgment indicates that it may be seriously damaged unless certain weight vehicles are prohibited.

(6) When the highway has inadequate turning radii horizontal width or underclearance at one or more locations.

(7) When an analysis of previous similar climactic conditions indicated that certain weight vehicles should have been prohibited from the highway.

(c) *Special considerations*. Weight restrictions shall be either in pounds or in tons (short ton which is equal to 2,000 pounds). To facilitate the enforcement or posting of weight or size restrictions, restrictions may be conversted to kinds or classes of vehicles.

(d) *Reference*. See 75 Pa.C.S. ¶¶ 4902(a) and 6109(a)(7) (relating to restrictions on use of highways and bridges; and specific powers of department and local authorities).

A review of § 201.81 makes it clear that one of the criteria set forth therein under subsection (b) must exist. Without such a condition existing, the Defendant, as a Township, is without the authority to pass an ordinance relating to restrictions on highways in order to prevent damage to the highway. Therefore, 75 Pa.C.S.A. § 6109, as it read in 1997, required a township, such as the Defendant, to conduct an engineering or traffic study and if as a result of such study, one of three criteria in 67 Pa.Code § 201.81 (b) relating to highways exist, the enactment of a municipal ordinance creating weight limits on a township highway is permitted pursuant to 75 Pa.C.S.A. § 6109(b) and (e).

Turning to the factual circumstances, despite the production of records from the 1982 and 1985 studies, nothing of record addresses the actual condition of Routes T-409 and T-412 (the routes to be used to access the Plaintiff's property) and the other routes referred to in the Weight Limit Ordinance. In the absence of knowing the condition of these two routes on August 9, 1997 when the ordinance was enacted, the Court is without power to grant summary judgment for the Defendant on this claim. Issues of fact regarding this claim shall proceed to a jury in accordance with 42 Pa.C.S.A. § 7539 (relating to

37

jury trials in declaratory judgment actions when issues of facts exist).

An appropriate Order follows.

**AND NOW**, this 30th day of November, 2007, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT

1) The Plaintiff's Motion for Partial Summary Judgment (Document No. 99) is DENIED; and

2) The Defendant's Motion for Partial Summary Judgment (Document No. 102) is DENIED IN PART as to Counts II and VII; and

3) The Defendant's Motion for Partial Summary Judgment (Document No. 102) is GRANTED IN PART WITH PREJUDICE by consent of the Plaintiff as to Count V.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**